IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
DAYTON DIVISION

JANE DOE,                              :        Case No. 3:20-cv-10
                                                Judge Walter Rice
            Plaintiff,                 :

V.                                     :

DAVE YOST, *Et Al.*,                   :

            Defendants.                :

_____

**PLAINTIFF JANE DOE'S *OMNIBUS***
**RESPONSE TO DEFENDANTS' RULE 12(c) MOTIONS**
**AND MOTION FOR JUDGMENT ON THE PLEADINGS**

_____

## I.    Introduction

In this case, Plaintiff Jane Doe, a politically active citizen who desires to speak out on matters of public concern, challenges the expansion of Ohio's Telecommunications Harassment and Menacing by Stalking statutes to social media posts and other online communication.  Doe has been chilled from engaging in democratic debate and discourse, because she has watched three other people who share her critical perspective face hundreds of criminal charges under these statutes that could send them to jail for a very long time.  Complaint, ¶¶ 5, 23-34.  She stopped posting on one particular forum, the "Justice for Chris" Facebook page, when its purported operators were arrested and each charged with 62 separate criminal offenses for comments they made online.  *Id*. at ¶¶ 5, 32.  Notably, all three of these cases arise in Mercer County, near where Doe lives, and were filed by the Mercer County Prosecutor, about whom Doe has been critical in her online commentary.  *Id*. at ¶¶ 23-29.  Quite simply, Doe is afraid to speak, particularly because

1

she lacks the resources to defend herself if the Mercer County Prosecutor comes after her. *Id*. at ¶ 32-34.

Doe's fear of prosecution is buttressed by the overly broad and unconstrained reach of Ohio's Telecommunications Harassment and Menacing by Stalking statutes, particularly as they apply to online social media posts. The Menacing by Stalking statute, Ohio Rev. Code § 2903.211, for example, expressly prohibits all forms of speech that knowingly cause mental distress to another person. As written, Ohio's Menacing by Stalking statute provides, in pertinent part, that:

> No person by engaging in a pattern of conduct shall knowingly … cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause … mental distress to the other person or the other person's family or household member, **the other person's mental distress may be based on words** or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

Ohio Rev. Code § 2903.211(A)(1) (emphasis added).[1] The Menacing by Stalking statute also contains two provisions that expressly expand the scope of the actions which constitute a violation of subsection (A)(1) to explicitly include speech and expressive conduct, as opposed to purely unexpressive conduct. First, the statute defines "pattern of conduct" as referenced in Ohio Rev. Code § 2903.211(A)(1), in part, as follows:

> **the posting of messages, use of intentionally written or verbal graphic gestures, or receipt of information or data through the use of any form of written communication** or an electronic method of remotely transferring information, including, but not limited to, a

---

[1] The omitted portions of the statute relate to threats of physical harm which, if true, would fall outside the ambit of the First Amendment. *See Virginia v. Black*, 538 U.S. 343 (2003). As a result, these portions of Ohio's Menacing by Stalking statute are not under attack in this lawsuit. This action relates solely to those portions of Ohio Rev. Code § 2903.211 that punish speech which causes mental distress as opposed to physical harm. For simplicity, Doe refers to the portions of the statute under attack in this case as the "Menacing by Stalking statute" throughout this memorandum.

> computer, computer network, computer program, computer system, or telecommunications device, may constitute a "pattern of conduct."

Ohio Rev. Code § 2903.211(D)(1) (emphasis added). The term "posting of messages" as used in this section is further defined as "transferring, sending, posting, publishing, disseminating, or otherwise communicating, or attempting to transfer, send, post, publish, disseminate, or otherwise communicate, any message or information, whether truthful or untruthful, about an individual, and whether done under one's own name, under the name of another, or while impersonating another." *Id*. at § (D)(7). As a result, the statute on its face labels both online speech and in-person communication, even speech that is true about another person, as conduct subject to being criminalized.

In addition to the broad coverage of subsection (A)(1), the Menacing by Stalking statute also contains a direct prohibition of online communication that causes another person mental distress. More specifically, subsection (A)(2) of the statute provides that:

> No person, ***through the use of any form of written communication or any electronic method of remotely transferring information***, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:
>
> (a) Violate division (A)(1) of this section;
>
> (b) Urge or incite another to commit a violation of division (A)(1) of this section.

Ohio Rev. Code § 2903.211(A)(2). This subsection further clarifies that speech communicated either online or in writing can form the basis of a prosecution for Menacing by Stalking.

Neither Ohio Rev. Code § 2903.211(A)(1) nor (A)(2) require that the communication be sent directly to the person suffering mental distress. To the contrary, the definition of "posting a

3

message" incorporates social media posts disseminated to a person's individualized network and other online communication that is generically disseminated to the public, such as through a blog or vlog. In fact, based on the language of the statute, a person could be prosecuted for a social media post that causes another person distress, even if the person making the post took all reasonable steps – such as limiting the post to the person's private Facebook or Twitter feed – to ensure the other person could not see it.

Initial violations of the Menacing by Stalking are misdemeanors of the first degree and carry up to six months in jail. A second violation after a prior conviction is a fourth-degree felony, which carries up to 18 months in prison. As such, an individual who guesses incorrectly about the legality of her online speech can therefore face prosecution for Menacing by Stalking and significant periods of incarceration if convicted.

The State of Ohio also criminalizes telecommunications harassment, which it defines, in part, as "mak[ing] or caus[ing] to be made a telecommunication, or permit[ting] a telecommunication to be made from a telecommunications device under the person's control, with purpose to abuse … or harass another person." Ohio Rev. Code § 2917.21(B)(1).[2] The statute does not define what is meant by the terms "abuse" or "harass." However, Ohio courts have interpreted the term "abuse" to mean "mistreat" and the term "harass" to mean "to annoy or torment repeatedly and persistently." *See, e.g., State v. Dennis*, No. 1-97-42, 1997 WL 691448, at

---

[2] The omitted portions of Ohio Rev. Code § 2917.21 relate to telecommunications made with the purpose of threatening another person. These threats, if deemed true, would fall outside the ambit of the First Amendment. *See Black*, 538 U.S. 343. As a result, these portions of Ohio's Telecommunications Harassment statute are not under attack in this lawsuit. This action relates solely to those portions of Ohio Rev. Code § 2917.21(B)(1) that punish speech which is communicated with the ostensible purpose to "abuse" or "harass." For simplicity, Doe refers to the portions of the statute under attack in this lawsuit as the "Telecommunications Harassment statute" throughout this memorandum.

*2 (Ohio 3d Dist. App. Oct. 30, 1997) (interpreting "purpose of being abusive, threatening, annoying, or harassing" as meaning "purpose to mistreat another person, to express a threat to another person, to irritate another, or to persistently torment"); *State v. Dart*, No. 23955, 2010 WL 4703406, at *4 (Ohio 2d Dist. App. Nov. 19, 2010) (citing Webster's New Revised University Dictionary (1994)) ("Harass means to annoy or torment repeatedly and persistently.").

The Telecommunications Harassment statute does not require that the allegedly harassing communications be directed specifically at the person who is harassed by them. Rather, the law criminalizes online speech when it is offered with the intent to be annoying, even if the speech is posted on a generalized website not likely to be seen by the target of the expression. *See* Ohio Rev. Code § 2917.21(B)(2) ("No person shall knowingly post a text or audio statement or an image on an internet web site or web page for the purpose of abusing, threatening, or harassing another person."). As a result, the Telecommunications Harassment statute, read literally, punishes online communication that is critical of the government or public figures or that other people may find annoying or irritating.

Violations of the Telecommunications Harassment statute are misdemeanors of the first degree punishable by up to six months in jail. Subsequent violations following an initial conviction are fifth-degree felonies punishable by up to 12 months in prison.

Doe's lawsuit challenges the facial unconstitutionality of these provisions under the First Amendment. She asserts a well-founded fear of prosecution based on the fact that similarly-situated speakers have also faced prosecution in Mercer County. She presents plausible, if not meritorious, claims that the Telecommunications Harassment and Menacing by Stalking statutes are impermissibly vague and overbroad. For the reasons that follow, Doe's claims survive the

5

Motions for Judgment on the Pleadings filed by the Attorney General and the Mercer County Prosecutor, and judgment as a matter of law should instead be granted in Doe's favor.

## II.     The Court Should Deny Defendants' Motions For Judgment On The Pleadings.

The standard by which courts assess motions for judgment on the pleadings under Fed. R. Civ. P. 12(c) is identical to the standard for motions to dismiss under Fed. R. Civ. P. 12(b)(6). *Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007).  Under that standard, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly,* 550 U.S. at 556). When assessing whether a plaintiff has set forth a "plausible" claim, the district court must accept all of the complaint's factual allegations as true.  *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).

Where the court relies upon evidence outside of the complaint in resolving a Rule 12(c) motion, the court implicitly converts the pleading to a summary judgment motion.  *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006).  Indeed, the mere presentation of evidence outside of the pleadings, absent the district court's rejection of such evidence, is sufficient to trigger the conversion of a Rule 12(c) motion to a motion for summary judgment. *See Moody v. United States*, 774 F.2d 150, 155 n.5 (6th Cir. 1985).  Under these standards, the Court must accept the factual allegations in Doe's complaint as true and must limit its inquiry to the four corners of the complaint. *Ziegler*, 249 F.3d at 512.

The Mercer County Prosecutor invites the Court in his Rule 12(c) motion to consider extrinsic evidence from other cases pending in state court.  The Court should decline this invitation

and focus instead on the complaint, which must be taken as true at this stage of the litigation. *Id*. Even if, however, the Court does take into consideration the various exhibits submitted by Mercer County, they are of no important to the facial First Amendment concerns raised in this lawsuit. In fact, as will be discussed in this brief, Mercer County's baseless prosecutions of other speakers under Ohio's fatally flawed Telecommunications Harassment and Menacing by Stalking statutes actually demonstrate the unconstitutional overbreadth of these laws.

Whatever its meaning, the extrinsic evidence submitted by Mercer County transforms its Rule 12(c) motion to one for summary judgment. *Max Arnold*, 452 F.3d at 503. Doe, however, has not yet been afforded the opportunity to conduct discovery on critical questions of statutory application, including how the statutes at issue in this case have been applied by Mercer County in the *Summers* and *Resawehr* cases.[3] As a result, if the Court considers the evidence submitted by Mercer County, it should afford Doe the opportunity to conduct discovery prior to converting the Rule 12(c) motion to a summary judgment motion. *See* Fed. R. Civ. P. 56(f).

### A. Doe Has Standing to File Suit.

When the First Amendment is at stake, courts take a relaxed approach to standing. *Sec. of State of Maryland v. Joseph H. Munson, Co., Inc.*, 467 U.S. 947, 957 (1984). "Litigants ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). For this reason, in First Amendment cases, the traditional

---

[3] As Exhibits 1 and 2 demonstrate, Doe has attempted to obtain discovery from a party to the Summers prosecution, but has been thwarted in that effort by an agreement advanced by the Mercer County Prosecutor that prohibits documents from that court case from being shared with third parties.

standing requirements of injury in fact, causation, and redressability are interpreted flexibly. *Eisenstadt v. Baird*, 405 U.S. 438, 445 n.5 (1972) ("Indeed, in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech."); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 546–47 (1981) ("The most important exception to this standing doctrine permits some litigants to challenge on First Amendment grounds laws that may validly be applied against them but which may, because of their unnecessarily broad reach, inhibit the protected speech of third parties."). When a controversy exists as to the facial validity of an enactment, "a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." *Village of Schaumburg v. Citizens for a Better Environ.*, 444 U.S. 620, 634 (1980).

In fact, pre-enforcement anticipatory challenges to statutes that regulate expression have served an important role in crafting the federal courts' First Amendment doctrine. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). As part of this tradition, parties wishing to challenge a statute before its enforcement need only demonstrate a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). To be sure, speakers have never been required "to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). Further, "[w]hen contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Epperson v. Arkansas*, 393 U.S. 97 (1968). When the plaintiff

has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188 (1973).  Indeed, plaintiffs bringing First Amendment challenges to criminal laws have never been required to "first expose [themselves] to actual arrest or prosecution." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979).  This standard enables a plaintiff to challenge the constitutionality of a criminal statute without being "required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.* (quoting *Doe*, 410 U.S. at 188).

In *SBA List*, the Supreme Court outlined a number of factual situations that give rise to anticipatory standing based on fear of prosecution. *SBA List*, 573 U.S. at 159-61.  First, the Court discussed *Steffel*, 415 U.S. 452, in which a direct threat of prosecution was levied against Vietnam War protestors who were distributing handbills. *SBA List*, 573 U.S. at 159 (citing *Steffel*, 415 U.S. at 459).  After police threatened arrest, one protestor was arrested, and the other filed suit.  In this instance, the lawsuit alleged a credible threat of enforcement, because the protestor had been warned to stop distributing handbills, was threatened with arrest if he continued, and desired to distribute literature in the future. *Id.*

Next, the Court addressed *Babbitt*, 442 U.S. 289, which involved a pre-enforcement challenge to an unfair labor practices law prohibiting the promotion of agricultural boycotts by fraud or deception. *Id*. at 159-60 (citing *Babbitt*, 442 U.S. at 301).  In *Babbitt*, the Court made clear that a party has standing to pursue an anticipatory challenge when she "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id*. at 160 (citing *Babbitt*, 442 U.S. at 298).  Such a circumstance existed in that case because the plaintiffs

had engaged in consumer publicity campaigns in the past and intended to continue engaging in these campaigns in the future. *Id*. Standing was therefore satisfied even though the plaintiffs disclaimed an intention to use fraud or deception in their campaigns, thereby potentially insulating their speech from future prosecution. *Id*. (citing *Babbitt*, 442 U.S. at 302).

The *SBA List* Court described two other situations in which parties had standing to challenge speech regulations prior to the laws being enforced against them. In *Virginia v. Amer. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988), the Court permitted an anticipatory challenge where bookstores presented 16 books they believed to be covered by a law prohibiting the display of material harmful to juveniles. *SBA List*, 573 U.S. at 160. Critical to the Court's conclusion that standing existed was its observation that the bookstores would need to take expensive and costly modifications to come into compliance with the challenged law. *Id*. And in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 8 (2010), the Court permitted advocacy organizations who had previously provided support to groups designated as terrorist organizations to challenge a law that potentially restricted their work. *SBA List*, 573 U.S. at 160-61. It did so in part because more than 150 people, who were not part of the advocates challenging the law in the case, had already been charged. *Id*. (citing *Holder*, 561 U.S. at 15). In other words, the fact that the law had been enforced against others gave rise to a well-founded fear on the part of the plaintiffs that the law might also be applied to them. *Id*.

Here, Doe has a well-founded fear that Ohio's Telecommunications Harassment and Menacing by Stalking statutes will be applied against her. Central to that fear – and indeed a primary source of it – is the fact that she has posted comments on the very same "Justice for Chris" Facebook page that is the subject of a 62-count indictment. Complaint, ¶¶ 25, 26, 35. Rather than face prosecution like the couple who allegedly operate that page, Doe has silenced her expression

for fear that she will be prosecuted. *Id*. at ¶¶ 5, 31, 32, 34. As a politically-aware citizen, she has followed the criminal prosecutions brought in Mercer County under the Telecommunications Harassment and Menacing by Stalking laws and fears that she will be prosecuted as well. *Id*. at ¶¶ 29-34. Notably, she has spoken out against the very same Mercer County officials as the other speakers who have face criminal charges there. *Id*.[4] Compounding her fear is the fact that she lacks the resources necessary to defend herself in the event she is prosecuted. *Id*.

These facts are highly similar to those found to give rise to standing in *SBA List* and the cases it discussed. For example, like the plaintiff in *Steffel*, Doe elected to silence her expression on the "Justice for Chris" Facebook page rather than face prosecution like its supposed operators. *Id*. at ¶ 32. Similar to the handbillers in *Steffel*, who were distributing similar anti-war literature, Doe and the Summers were offering speech critical of governmental action; as the Court determined in *Steffel*, the prosecution of that expression by a fellow speaker gives rise to a reasonable fear that Doe herself will be arrested and charged. *Steffel*, 415 U.S. at 459. As was the

---

[4] Ongoing factual investigation is likely to reveal the dubious nature of the Mercer County prosecutions. For example, in his Rule 12(c) motion, the Mercer County Prosecutor alleges that the "Justice for Chris" Facebook page targeted the victim in the Chris Summers sexual abuse case and caused her anguish. But this assertion belies the way that Facebook works. In order to even access the content on the page, the victim would have had to take affirmative action to navigate to this specific Facebook page; the page does not itself push its content to the victim. *See* https://www.facebook.com/justiceforchrissummers. Why would the victim have purposefully sought out the page? Why would she have taken affirmative steps to view its content? Doe believes the answers to those critical questions will be answered by documents presently under subpoena – namely the police reports in the Summers case. *See* Exhibit 1 (Subpoena to Charles Alan Summers).

Adding to the questionable conduct of the Mercer County Prosecutor is the fact that the Summers police reports, which are otherwise public records, are the subject of a protective order agreement in the Summers prosecution that forbids Summers from disseminating these public records to third parties. *See* Exhibit 2 (Letter from Dennis Sawan). Why is the Mercer County Prosecutor trying to hide public police reports? Is it because he himself alerted the victim to the Facebook page and encouraged her to view it? If so, the Prosecutor's actions would only heighten Doe's fear of prosecution in this case.

case in *Holder*, 561 U.S. at 15, another factor weighing in favor of standing is that the laws have been recently enforced against similarly-situated parties. Complaint, at ¶¶ 23-28. In the short time since the expanded statutes were adopted, the Mercer County Prosecutor has brought charges against three other speakers who have criticized Mercer County officials online – creating fear and trepidation that others too may be criminally charged. *Id*. In addition, as was the case in *Babbitt*, the fact that Doe has not alleged a desire to violate the law through her speech, or may not have alleged a perfect fit between her purported speech and the elements of the statutes at issue, is not fatal to her claims. *See Babbitt*, 442 U.S. at 302. Rather, because she has a well-founded fear – based upon the fact that she commented in a forum that has been the subject of prosecution – that she too will face prosecution and will be unable to defend herself. Complaint, at ¶¶ 5, 29-34.

In a misguided attempt to defeat standing, the Mercer County Prosecutor alleges that he would not enforce the challenged statutes against speakers like Doe. But when it comes to the First Amendment, courts are not required to accept the government's promises that it will enforce problematic statutes in lawful ways. *United States v. Stevens*, 559 U.S. 460, 480 ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). The mere fact that Mercer County has levied **62** criminal allegations against the purported operators of a Facebook forum on which Doe commented is enough to make any reasonable person afraid that they will be prosecuted next.

The Mercer County Prosecutor's motion focuses heavily on the underlying facts of the three criminal prosecutions that give rise to Doe's fear of prosecution: *State v. Resawehr*, *State v. Charles Summers*, and *State v. Vicki Summers*. It spends pages and pages of its brief discussing the type of speech offered by these defendants and the multiplicity of criminal charges faced by Mr. Resawehr, Mr. Summers, and Mrs. Summers. It faults Doe for inaccurately recounting which

specific types of expression relate to which specific charges in these cases, relating with a sense of importance that Mr. Resawehr's communications about Mercer County officials resulted in him being charged with obstruction of official business and not Telecommunications Harassment or Menacing by Stalking. It also notes, again with asserted significance, that the portions of Mr. Resawehr's speech criticizing Mercer County officials were interwoven with interpersonal communications directed to Mr. Resawehr's family members.

All of this proves Doe's point. In order to feel secure in communicating critically about the government in Mercer County, an ordinary citizen must not only spend a significant amount of time perusing court dockets, but must also become an overnight expert in the finer points of free speech law. Cases so complex they take pages of briefing to explain can hardly provide adequate notice to ordinary people about what is and is not permissible to say without risking prosecution. When faced with the choice between guessing wrong about the legality of one's expression and risking imprisonment or staying quiet, rational people – including Jane Doe – will choose the latter. *Virginia v. Amer. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988).

In addition, both Mercer County and the Attorney General also attempt to distinguish Doe's expression from that at issue in the *Summers* and *Resawehr* cases, but this too is a distinction without a difference. For one thing, they argue that the speech in Summers targeted the victim in a criminal sexual assault case, but a simple review of the posts on the "Justice for Chris" Facebook page reveal this is not true. Contrary to the representations of Defendants, the dialogue on that page is highly critical of Mercer County law enforcement officials and their investigation tactics and also highlights certain deficiencies in the Chris Summers criminal trial. *See, e.g.,* https://www.facebook.com/justiceforchrissummers ("The recent trial of Jeff Rasawehr has helped expose the corruption and bullying that characterize the Mercer County Persecutor's office and the shame

that office is bringing on the county. The persecutor doesn't want to go to trial (too much work and too much of a chance that he won't win.) His strategy then is to pile as many charges as possible and push hard for the accused to take a plea deal.") (June 3, 2019).  As a result, the argument that Doe's expression is not targeted to a private citizen is without import, given that the "Justice for Chris" Facebook page bears the same quality and yet is still the subject of prosecution. Moreover, under *Babbitt*, Doe's expression does not have to meet every element of the challenged statutes, so long as she maintains a reasonable fear that she will be prosecuted regardless.  *Babbitt*, 442 U.S. at 302.

In sum, Doe is reasonably afraid that the Mercer County Prosecutor will criminally charge her for Telecommunications Harassment, Menacing by Stalking, or both.  She has engaged in active online commentary about the very same Mercer County officials whose criticism prompted prosecution in the Summers and Resawehr cases.  She has posted in the very same forum that is the subject of prosecution.  Due to their highly publicized nature, she is intimately aware – and afraid – of the charges being levied against Mr. Resawehr, Mr. Summers, and Mrs. Summers in Mercer County.  She has self-censored her expression out of fear that she will be next.  Under the clear authority of *SBA List*, *Steffel*, *Babbitt*, *Holder*, *Broadrick*, and their progeny, Doe has pleaded a well-founded fear of imminent prosecution and has therefore suffered an injury in fact sufficient to support standing.

Given that Doe has established constitutional standing, the Rule 12(c) motions should be denied.  But even if the Court finds that she lacks standing, the motions should still be denied on the grounds that a lack of standing does not support judgment in Defendants' favor.  Rule 12(c) motions should only be granted where the moving party establishes that it is entitled to judgment as a matter of law.  *JPMorgan Chase Bank N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007).

Because cases in which the plaintiff lacks standing are not justiciable, courts cannot reach the merits of those matters to assess which party is entitled to judgment. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Stated more simply, assuming *arguendo* that Doe lacks standing – a conclusion she emphatically rejects – Defendants have asked for the wrong relief. They are not entitled to a judgment in their favor on the basis of non-justiciability.

> **B.  Doe Raises Plausible, if not Meritorious, First Amendment Challenges to Ohio's Telecommunications Harassment and Menacing by Stalking Statutes.[5]**

As a starting point in this litigation, and indeed in all legal actions involving the right of free expression, speech about public officials and matters of public concern is presumptively protected by the First Amendment. *See Snyder v. Phelps*, 562 U.S. 443 (2011); *New York Times v. Sullivan*, 376 U.S. 254 (1964). The First Amendment to the United States Constitution provides virtually unfettered protection of the right to engage in political expression. *See Meyer v. Grant*, 486 U.S. 414, 420 (1988). This is true even when the political speech being offered is critical to the government or exposes the misdeeds of government officials. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

> **1.  Overbroad laws violate the First Amendment.**

Consistent with this protection, the Fourteenth Amendment Due Process Clause requires that laws refrain from punishing unintended, innocent, or constitutionally protected conduct. *See Broderick v. Oklahoma*, 413 U.S. 601, 613 (1973); *Coates v. City of Cincinnati*, 402 U.S. 611 (1971). Pursuant to this protection, a law is facially void for overbreadth if it "does not aim

---

[5] Only the Attorney General seeks judgment on the pleadings on the merits of Doe's First Amendment claims. The Mercer County Prosecutor does not allege this basis for relief.

specifically at evils within the allowable area of [government] control, but . . . sweeps within its ambit other activities that . . . constitute an exercise" of constitutionally protected expression. *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). The statutory language may be very clear, yet "sweep unnecessarily broadly to invade the areas of protected freedoms." *Record Revolution #6, Inc. v. City of Parma*, 638 F.2d 916, 927 (6th Cir. 1980) (citing *Sawyer v. Sandstrom*, 615 F.2d 311 (5th Cir. 1980), *rev'd. on other grounds*, 451 U.S. 1013 (1981)). In this manner, an overbroad statute enacts a chilling effect on constitutionally protected or otherwise lawful conduct. *Id.* Laws which are overbroad and threaten the exercise of First Amendment rights are therefore unconstitutional. *Broadrick*, 413 U.S. 601.

The doctrine of overbreadth focuses on the potential reach of a regulation rather than on its precision. Under the overbreadth doctrine, a law will be declared unconstitutional on its face if its sweep is unnecessarily broad and if it threatens to ensnare within its reach either constitutionally-protected activity or otherwise legitimate and innocent conduct. *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997); *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972); *Zwickler v. Koota*, 389 U.S. 241, 250 (1967); *Coates*, 420 U.S. at 614. Where a law reaches "a substantial number of impermissible applications," when judged against its "plainly legitimate sweep," it is fatally overbroad and may not be enforced. *New York v. Ferber*, 458 U.S. 747, 771 (1982); *Broadrick*, 413 U.S. at 613, 615.

In the context of statutes targeting interpersonal harassment or stalking, numerous courts have invalidated laws that criminalize expression causing distress or anguish to another party as unconstitutionally overbroad. For example, in *Matter of Welfare of A.J.B.*, 929 N.W.2d 840 (Minn. 2019), the Minnesota Supreme Court held unconstitutionally overbroad the terms "disturb" and "mental distress" in the state's stalking-by-mail statute. There, the court observed that even a

16

"knowing" *mens rea*, requiring the speaker to know that his speech would cause mental distress to another person, did not save the statute. *Id*. at 856-57. This was so because speech that is communicated with knowledge of its negative impacts is still constitutionally protected. *Id*. at 853. As an example of the kind of speech that falls within the scope of First Amendment protection but would still violate the statute, the court offered the following:

> A vocal and well-known constituent delivers four or five letters over the course of two weeks to a local city councilperson saying, "I hate your position on gun control and I will organize a campaign to unseat you!" The letters make the city councilperson feel that his or her power, social standing, or self-esteem is in danger. It causes the councilperson to worry or feel depressed and intimidated so as to deter the councilperson from pursuing the gun-control measure. Further, the constituent should know that the letters would cause that effect; it is, in fact, the whole point of sending the letters. Finally, the speech does not fall within one of the specific categories excepted from criminalization [under the Minnesota statute]. No one would dispute that the constituent's letters reside at the core of protected First Amendment speech, but those communications fall within the plain language of [the law].

*Id*. Because speech at the core of the First Amendment remained subject to criminal prosecution under the Minnesota statute, the court invalidated portions of the law. *Id*. at 858.

Similarly, in *People v. Relerford*, 104 N.E.2d 341 (Ill. 2017), the Illinois Supreme Court invalidated a provision of the state's expanded stalking statute that provided as follows: "A person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to: (1) fear for his or her safety or the safety of a third person; or (2) suffer other emotional distress." *Id*. at 348-49. This provision, the court noted, "reaches a host of social interactions that a person would find distressing but are clearly understood to fall within the protections of the first amendment," including advocating for boycotts of companies that engage in

environmental pollution or offering a speech at a town hall meeting that is critical of a particular official.  *Id*. at 353-54.

Much like the statutes at issue in *A.J.B.* and *Relerford*, Ohio's Telecommunications Harassment and Menacing by Stalking statutes sweep within their ambit a wide range of communication protected by the First Amendment.  Ohio's Menacing by Stalking statute provides, in pertinent part, as follows:  "No person by engaging in a pattern of conduct shall knowingly … cause mental distress to the other person or a family or household member of the other person." Ohio Rev. Code § 2903.211(A)(1).  Under this provision, all of the following communications would violate the terms of the statute, although unquestionably protected by the First Amendment:

- A parent aggressively criticizes teachers for not wanting to return to the classroom during the pandemic, even though he is aware his posts may cause teachers to suffer further distress from online criticism of their safety concerns;

- A doctor provides information to a patient on a terminal or difficult diagnosis, where the doctor knows that the patient will experience distress and anguish as a result of that information;

- A news reporter broadcasts a story on a natural disaster, tragic accident, or war, knowing that members of the community will feel distress over the content of the story;

- A teenager breaks up with her boyfriend by text, knowing that he will be hurt by her decision;

- A picketer displays an aborted fetus on an anti-abortion poster outside an abortion clinic, knowing that the sight of an aborted baby will cause distress to mothers and to those who oppose abortion;

- A police officer informs a family member of the death of a loved one in a traffic accident, with the expectation that the family member will experience distress and pain as a result;

- A teacher posts grades online with the awareness that some students who underperformed will suffer from an extreme sense of failure and depression when they receive poor marks;

- A political activist exposes governmental corruption with the knowledge that the involved government officials will feel distressed over their loss of power; and

- A filmmaker addresses emotionally difficult topics such as suicide, knowing that audience members who lost loved ones to suicide will be distressed by the content.

And these are just the tip of the iceberg.  It does not constrain the imagination to come up with numerous examples of words that are spoken with knowledge they will cause harm, but that are fully protected by our Constitution.  So common is this occurrence, in fact, that the Supreme Court has observed:  "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Ohio's Telecommunications Harassment statute is no less broad.  It prohibits "mak[ing] or caus[ing] to be made a telecommunication, or permit[ting] a telecommunication to be made from a telecommunications device under the person's control, with purpose to abuse … or harass another person."  Ohio Rev. Code § 2917.21(B)(1).  While the terms "abuse" and "harass" are undefined, Ohio courts have interpreted the term "abuse" to mean "mistreat" and the term "harass" to mean "to annoy or torment repeatedly and persistently."  *See, e.g., Dennis*, 1997 WL 691448, at *2; *Dart*, 2010 WL 4703406, at *4.

19

Under this statute, a similar range of constitutionally-protected expression would be at risk. Protestors who persisted in contacting their local representatives about a particular problematic issue may have the intent to annoy the government into action. (In fact, this was the precise example the court relied upon in demonstrating the overbreadth of the Illinois statute in *Relerford*, 104 N.E.2d at 354.) Yet their expression could be criminalized as Telecommunications Harassment. So too could a teacher be at risk for repeatedly emailing an unmotivated student to turn in his homework, or a parent who repeatedly texts her child to clean his room, or a customer who wants to lodge complaints with the cable company about his broken internet. The sweep of the statute is so broad that almost any constructive feedback, if communicated electronically, could trigger criminal prosecution.

Given that the challenged statutes in this case are plainly overbroad, the Court should deny the Attorney General's motion for judgment on the pleadings as to Doe's First Amendment claims.

### 2. Vague laws violate the First Amendment.

The United States Supreme Court has long held that vague laws violate due process in three distinct ways. First, vague laws fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In failing to provide "fair warning," vague laws may trap innocent persons who would otherwise obey the law. *Id.* at 108; *see also Jordan v. DeGeorge*, 341 U.S. 223, 231-32 (1951).

Second, vague laws encourage arbitrary and discriminatory enforcement by not providing explicit standards for those who apply them. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries, for resolution on an *ad hoc* and subjective basis." *Grayned*, 408 U.S. at 109. "[Without express standards by which to measure an official's actions],

*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 758 (1988); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) (all holding that laws that confer discretion to government officials as to whether to permit or deny expressive activity are unconstitutionally vague).

Third, in cases involving First Amendment freedoms, vague laws inhibit the exercise of those freedoms. "Uncertain meanings lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden area were clearly marked." *Grayned*, 408 U.S. at 109. In order to prevent this chilling effect on constitutionally-protected expression, a greater degree of specificity is required in order for any law that impinges on protected expression to survive a vagueness challenge. *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *Smith v. California*, 361 U.S. 147 (1957). The federal courts cannot supply this specificity and should generally refrain from "rewrit[ing] a state law to conform it to constitutional requirements." *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988).

These concerns are heightened when a potentially vague law targets constitutionally-protected speech. *See, e.g., Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 532 (Tenn. 1993). "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith*, 415 U.S. at 573; *see also City of Knoxville v. Entertainment Resources LLC*, 166 S.W.3d 650, 656 (Tenn. 2005) ("Particularly when

speech is being regulated, the Constitution demands that government bodies make a greater attempt to define what conduct is prohibited to avoid chilling protected speech.").

Ohio's Telecommunications Harassment and Menacing by Stalking statutes suffer from a lack of definitional clarity around key terms that define what speech is and is not covered. For example, the Menacing by Stalking statute fails to provide specific criteria for what speech would cause mental distress or how a speaker would be able to ascertain the impact of his prospective speech on a listener. Nor does the statute set any objective criteria by which to measure the impact of words on a putative audience. So too does the Telecommunications Harassment statute, even as judicially construed, fail to define exactly what speech "abuses," "annoys," or "mistreats" another person. Presumably these concepts change from person to person, as no two people are likely to have the same reaction to commentary and debate. *See Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (discussing First Amendment dangers of vague regulations of speech, including vacillating meaning depending upon audience).

Problematically, these gaps in essence authorize a heckler's veto, where the most sensitive listener with the most fragile emotions can transform innocent expression into a crime. *See, e.g., Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015). The First Amendment does not allow the protection afforded to speech to rise or fall based upon listeners' reaction to it. *Id*. In failing to objectively define what expression will violate the statutes, and in allowing the audience to determine through their reaction whether speech is criminal or not, Ohio's Telecommunications Harassment and Menacing by Stalking statutes are void for vagueness.

### C. This Court Should not Abstain from Ruling in this Case.

The Mercer County Prosecutor seeks this Court's abstention under the *Younger* and *Pullman* abstention doctrines. As an initial matter, abstention and judgment are not synonymous;

a court that abstains explicitly *avoids* addressing the merits of an action and would therefore be unable to address the fundamental Rule 12(c) question as to whether the moving party is entitled to judgment as a matter of law.  *See, e.g., Carroll v. City of Mount Clemens,* 139 F.3d 1072, 1075 (6th Cir. 1998) (holding that, when abstaining, the proper course of action is a stay of the claim rather than dismissal).

Moreover, both forms of abstention are wholly inappropriate here.  *Younger* does not apply because Doe is not currently facing prosecution in state court and therefore lacks a pending state forum in which to raise her constitutional claims.  *See Middlesex Cty. Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982) (holding that pending state action must afford ***the federal plaintiff*** a forum for asserting her constitutional challenges); *Nimer v. Litchfield Twp. Bd. of Trustees*, 707 F.3d 699 (6th Cir. 2013) (same).  *Pullman* abstention is equally unwarranted, because there are no uncertain issues of state law the state courts must resolve.  This is particularly the case given the Mercer County Prosecutor's contradictory representation elsewhere in his motion that Ohio courts have narrowly construed the statutes at issue here.

As the Supreme Court has noted, *Pullman* abstention imposes great burdens on the parties to return to state court and seek clarification on a particularly complex question of state law before invoking the federal court's review.  *See, e.g., Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997).  As a result, *Pullman* abstention is particularly inappropriate in cases involving the First Amendment.  *City of Houston v. Hill*, 482 U.S. 451, 467 (1987); *James v. Coleman*, 848 F.3d 744, 750 (6th Cir. 2017).  This is especially the case where a federal lawsuit challenges an overbroad law that has no limiting construction.  *Coleman*, 848 F.3d at 750 (citing *Dombrowski v. Pfister*, 380 U.S. 479, 489-90 (1965)) ("[A]bstention ... is inappropriate for cases [in which] ... statutes are justifiably attacked on their face as abridging free expression.").  "In such case[s] to

force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967).

*Pullman* abstention does not apply here precisely for these reasons. The Mercer County Prosecutor offers no specific issues that the state court can clarify, nor any particular construction the state courts can afford that would alleviate the constitutional concerns raised in this case. Nor does the Mercer County Prosecutor take into account the time and resources that would be necessary to pursue such a course of action in state court, all the while Doe remains silenced and chilled. The First Amendment simply forecloses *Pullman* abstention in this case.

### D. Doe Can Proceed in Pseudonym.

The Sixth Circuit considers four factors or scenarios in determining when a litigant can sue using a pseudonym. They include: 1) whether the plaintiff seeking anonymity is suing to challenge government activity; 2) whether prosecution of the suit will compel the plaintiff to disclose information of "the utmost intimacy;" 3) whether the litigation compels the plaintiff to disclose an intention to violate the law or to risk criminal prosecution; and 4) whether the plaintiff is a child. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). Two of the four scenarios are present in this case. First, Doe sues to challenge the government and therefore reasonably seeks to hide her identity to avoid retaliation. *Id*. Second, Doe discloses in this action that she has in the past engaged in social media posts of the type that have been subjected to criminal prosecution and indicates that she wants to engage in this form of speech in the future. *Id*. She therefore risks criminal prosecution, like that faced by Summers and Resawehr, by filing this lawsuit. Given these considerations, Doe can proceed by using a pseudonym in this case.

### III.    The Court Should Grant Judgment On The Pleadings In Doe's Favor.

Doe is entitled to judgment on the pleadings on her facial attacks to the challenged statutes. As demonstrated in Section III(B), *supra*, the challenged portions of Ohio's Telecommunications Harassment and Menacing by Stalking statutes are impermissibly vague and overbroad in violation of the First Amendment.  Taking the allegations in Doe's complaint as true, Doe has established as a matter of law that she is entitled to declaratory and injunctive relief.  *Ziegler*, 249 F.3d at 512. The Court should award judgment in her favor.  *See* Fed. R. Civ. P. 12(c).

### IV.    Conclusion

For the foregoing reasons, the Motions for Judgment on the Pleadings filed by the Attorney General and the Mercer County Prosecutor are not persuasive and should be denied.  Jane Doe has standing to sue, because she maintains a well-grounded fear of prosecution if she continues to speak out as she has in the past about governmental officials in Mercer County.  Jane Doe raises valid and meritorious claims regarding the unconstitutional vagueness and overbreadth imposed by the challenged portions of Ohio's Telecommunications Harassment and Menacing by Stalking statutes.  The *Younger* and *Pullman* abstention doctrines are irrelevant and inappropriate here. And Jane Doe can proceed in pseudonym, given her fear of prosecution.  The Court should accordingly deny Defendant's Rule 12(c) motions and should instead grant judgment on the pleadings in favor of Jane Doe.

Respectfully Submitted,

 /s/ Jennifer M. Kinsley
JENNIFER M. KINSLEY (0071629)
Kinsley Law Office
Post Office Box 19478
Cincinnati, OH 45219
kinsleylawoffice@gmail.com
513.708.2595


/s/ Matt Miller-Novak
Matthew Miller-Novak (Ohio Bar No. 0091402)
Barron Peck Bennie & Schlemmer Co., LPA
3074 Madison Rd.
Cincinnati, OH 45209
mmn@bpbslaw.com
513.721.1350

Counsel for Plaintiff Jane Doe


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing disclosures was provided to all counsel of record via email on the 26th of August, 2020.

 /s/ Jennifer M. Kinsley
JENNIFER M. KINSLEY (0071629)