IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
DAYTON DIVISION

| | | |
|---|---|---|
| JANE DOE, | : | Case No. 3:20-cv-10 |
| | | Judge Walter Rice |
| Plaintiff, | : | |
| | | |
| V. | : | |
| | | |
| DAVE YOST, *Et Al.*, | : | |
| | | |
| Defendants. | : | |

---

**PLAINTIFF JANE DOE'S OBJECTION TO
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

## I.      Introduction

This lawsuit involves a facial constitutional challenge to limited portions of two Ohio statutes – the Telecommunications Harassment statute and the Menacing by Stalking statute – that restrict First Amendment rights.  Following a series of prosecutions by the Mercer County Prosecutor under the challenged portions of the statutes, Plaintiff Jane Doe has silenced her online expression out of fear that she too will face criminal charges.  Buttressing Doe's fear is the fact that she has in the past commented on a social media platform that has formed the basis of one Mercer County prosecution.  Despite Doe's well-founded and reasonable fear, on December 17, 2020, the Magistrate Judge recommended dismissal of her lawsuit on the ground that she lacks standing to challenge the laws in question.  *See* Doc. 26 Report and Recommendation ("R and R").

As explained in this Objection, the Magistrate Judge's Report and Recommendation takes too narrow and too restrictive a view of constitutional standing.  As a starting point, traditional standing requirements are relaxed in First Amendment cases like this one, and litigants are

permitted to raise the free speech rights of others in mounting facial challenges to government action. *See, e.g., Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). This is so because "some broadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected." *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984). The Magistrate Judge departed from these fundamental principles by employing a more rigid standing inquiry than the First Amendment requires.

First, the Magistrate Judge erred by mandating that Doe's speech be identical to speech offered by others under prosecution in order to vest her with standing. Contrary to the Magistrate Judge's decision, First Amendment case law has never required that a putative speaker's prospective speech be exactly the same as speech subject to prosecution in order to consider an anticipatory challenge. Quite the opposite, in fact. Under the Sixth Circuit's decision in *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016), all that is required to demonstrate standing is a chilling effect on the speaker and a fear of prosecution, made reasonable by the application of the challenged law to others. *McKay* does not require the formulaic, rigid analysis employed by the Magistrate Judge.

Second, even if a high degree of similarity is required between speech that has been prosecuted in the past and Doe's proposed, but chilled, speech, the facts of this case meet that threshold. As described in her complaint, Doe's proposed expression is similar in nature to that being prosecuted in Mercer County. For example, as the Ohio Supreme Court observed, the "Justice for Chris" Facebook page that formed the basis of one of the Mercer County prosecutions contains critical governmental commentary of the exact variety Doe intends to offer. *See State ex rel. Summers v. Fox*, 2020-Ohio-5585, 2020 WL 7250544, at ¶ 9 (Ohio Dec. 10, 2020). Doe

herself commented on this very Facebook page, exacerbating her fear that she too will be prosecuted. Given the similarity of Doe's chilled expression and that being indicted in Mercer County as Telecommunications Harassment and Menacing by Stalking, Doe is reasonable to fear that she risks facing charges too.

Lastly, the Magistrate Judge's recommendation departs from the lengthy tradition of permitting anticipatory challenges, in advance of prosecution, when First Amendment rights are at stake. In fact, a significant volume of the Supreme Court's free speech jurisprudence has arisen from cases of this nature. If permitted to stand, the Magistrate Judge's decision endangers the ability of speakers to mount pre-enforcement challenges to facially invalid laws, leaving free speech rights subject to the whims of rogue and aggressive prosecutors.

For these reasons, as explained in more detail below, the Court should reject the Magistrate Judge's Report and Recommendation and should hold that Plaintiff Jane Doe has standing to challenge the constitutionality of limited portions of Ohio's telecommunications harassment and menacing by stalking statutes.

## II. The Court Should Reject The Magistrate Judge's Report And Recommendation.

### A. Standing is Relaxed in First Amendment Cases.

When the First Amendment is at stake, courts take a relaxed approach to standing. *Sec. of State of Maryland v. Joseph H. Munson, Co., Inc.*, 467 U.S. 947, 957 (1984). "Litigants ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612. For this reason, in First Amendment cases, the traditional standing requirements of injury in fact, causation, and redressability are interpreted flexibly. *Eisenstadt v. Baird*, 405

3

U.S. 438, 445 n.5 (1972) ("Indeed, in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech."); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 546–47 (1981) ("The most important exception to this standing doctrine permits some litigants to challenge on First Amendment grounds laws that may validly be applied against them but which may, because of their unnecessarily broad reach, inhibit the protected speech of third parties."). When a controversy exists as to the facial validity of an enactment, "a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." *Village of Schaumburg v. Citizens for a Better Environ.*, 444 U.S. 620, 634 (1980).

In fact, pre-enforcement anticipatory challenges to statutes that regulate expression have served an important role in crafting the federal courts' First Amendment doctrine. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). As part of this tradition, parties wishing to challenge a statute before its enforcement need only demonstrate a "***realistic danger*** of sustaining a direct injury as a result of the statute's operation or enforcement." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (emphasis added). To be sure, speakers have never been required "to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). Further, "[w]hen contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Epperson v. Arkansas*, 393 U.S. 97 (1968). When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with

a constitutional interest, but proscribed by a statute, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188 (1973). Indeed, plaintiffs bringing First Amendment challenges to criminal laws have never been required to "first expose [themselves] to actual arrest or prosecution." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979). This standard enables a plaintiff to challenge the constitutionality of a criminal statute without being "required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.* (quoting *Doe*, 410 U.S. at 188).

In *SBA List*, the Supreme Court outlined a number of factual situations that give rise to anticipatory standing based on fear of prosecution. *SBA List*, 573 U.S. at 159-61. First, the Court discussed *Steffel*, 415 U.S. 452, in which a direct threat of prosecution was levied against Vietnam War protestors who were distributing handbills. *SBA List*, 573 U.S. at 159 (citing *Steffel*, 415 U.S. at 459). After police threatened arrest, one protestor was arrested, and the other filed suit. In this instance, the lawsuit alleged a credible threat of enforcement, because the protestor had been warned to stop distributing handbills, was threatened with arrest if he continued, and desired to distribute literature in the future. *Id*.

Next, the Court addressed *Babbitt*, 442 U.S. 289, which involved a pre-enforcement challenge to an unfair labor practices law prohibiting the promotion of agricultural boycotts by fraud or deception. *Id*. at 159-60 (citing *Babbitt*, 442 U.S. at 301). In *Babbitt*, the Court made clear that a party has standing to pursue an anticipatory challenge when she "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id*. at 160 (citing *Babbitt*, 442 U.S. at 298). Such a circumstance existed in that case because the plaintiffs had engaged in consumer publicity campaigns in the past and intended to continue engaging in

these campaigns in the future. *Id*. Standing was therefore satisfied even though the plaintiffs disclaimed an intention to use fraud or deception in their campaigns, thereby potentially insulating their speech from future prosecution. *Id*. (citing *Babbitt*, 442 U.S. at 302).

The *SBA List* Court described two other situations in which parties had standing to challenge speech regulations prior to the laws being enforced against them. In *Virginia v. Amer. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988), the Court permitted an anticipatory challenge where bookstores presented 16 books they believed to be covered by a law prohibiting the display of material harmful to juveniles. *SBA List*, 573 U.S. at 160. Critical to the Court's conclusion that standing existed was its observation that the bookstores would need to take expensive and costly modifications to come into compliance with the challenged law. *Id*. And in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 8 (2010), the Court permitted advocacy organizations who had previously provided support to groups designated as terrorist organizations to challenge a law that potentially restricted their work. *SBA List*, 573 U.S. at 160-61. It did so in part because more than 150 people, who were not part of the advocates challenging the law in the case, had already been charged. *Id*. (citing *Holder*, 561 U.S. at 15). In other words, the fact that the law had been enforced against others gave rise to a well-founded fear on the part of the plaintiffs that the law might also be applied to them. *Id*. In acknowledging the reasonableness of the plaintiffs' fear of prosecution, the Court did not examine how closely the plaintiffs' speech resembled that of the charged individuals, nor did it require that the plaintiffs' speech be identical to that at issue in the more than 150 criminal cases. *Holder*, 561 U.S. at 16.

Given the Supreme Court's analysis in *SBA List*, and the generally relaxed standing inquiry employed in First Amendment cases, the Magistrate Judge erred in requiring that Doe's speech and the speech in pending criminal cases be identical.

6

**B.**     **Doe's Prospective Speech is Comparable to the Speech of Others who Have Been Prosecuted under the Challenged Statutes.**

Even if the Magistrate Judge is correct that a plaintiff's expression must be substantially similar to speech already indicted or restricted under the challenged laws, Doe's case meets this threshold.  To be sure, Doe has a well-founded fear that Ohio's Telecommunications Harassment and Menacing by Stalking statutes will be applied against her.  Central to that fear – and indeed a primary source of it – is the fact that she has posted comments on the very same "Justice for Chris" Facebook page that is the subject of a 62-count indictment.  Complaint, ¶¶ 25, 26, 35.  Rather than face prosecution like the couple who allegedly operate that page, Doe has silenced her expression for fear that she will be prosecuted.  *Id.* at ¶¶ 5, 31, 32, 34.  As a politically-aware citizen, she has followed the criminal prosecutions brought in Mercer County under the Telecommunications Harassment and Menacing by Stalking laws and fears that she will be prosecuted as well.  *Id.* at ¶¶ 29-34.  Notably, she has spoken out against the very same Mercer County officials as the other speakers who have face criminal charges there.  *Id.*  Compounding her fear is the fact that she lacks the resources necessary to defend herself in the event she is prosecuted.  *Id.*

These facts are highly similar to those found to give rise to standing in *SBA List* and the cases it discussed.  For example, like the plaintiff in *Steffel*, Doe elected to silence her expression on the "Justice for Chris" Facebook page rather than face prosecution like its supposed operators. *Id.* at ¶ 32.  Similar to the handbillers in *Steffel*, who were distributing similar anti-war literature, Doe and the Summers were offering speech critical of governmental action; as the Court determined in *Steffel*, the prosecution of that expression by a fellow speaker gives rise to a reasonable fear that Doe herself will be arrested and charged.  *Steffel*, 415 U.S. at 459.  As was the case in *Holder*, 561 U.S. at 15, another factor weighing in favor of standing is that the laws have

7

been recently enforced against similarly-situated parties. Complaint, at ¶¶ 23-28. In the short time since the expanded statutes were adopted, the Mercer County Prosecutor has brought charges against three other speakers who have criticized Mercer County officials online – creating fear and trepidation that others too may be criminally charged. *Id*. In addition, as was the case in *Babbitt*, the fact that Doe has not alleged a desire to violate the law through her speech, or may not have alleged a perfect fit between her purported speech and the elements of the statutes at issue, is not fatal to her claims. *See Babbitt*, 442 U.S. at 302. Rather, because she has a well-founded fear – based upon the fact that she commented in a forum that has been the subject of prosecution – that she too will face prosecution and will be unable to defend herself. Complaint, at ¶¶ 5, 29-34.

The Magistrate Judge rejected Doe's standing on the basis that her chilled expression had a dissimilar target from the cases pending in Mercer County. For example, the Magistrate Judge observed that the Summers and Rasawehr cases involve expression that is critical of private parties, rather than the government. But this is not entirely accurate. For example, the Magistrate Judge determined that the speech in Summers targeted the victim in a criminal sexual assault case, but a simple review of the posts on the "Justice for Chris" Facebook page reveal this is not true. Contrary to the Magistrate Judge's report, the dialogue on that page is highly critical of Mercer County law enforcement officials and their investigation tactics and also highlights certain deficiencies in the Chris Summers criminal trial. *See, e.g.,* https://www.facebook.com/justiceforchrissummers ("The recent trial of Jeff Rasawehr has helped expose the corruption and bullying that characterize the Mercer County Persecutor's office and the shame that office is bringing on the county. The persecutor doesn't want to go to trial (too much work and too much of a chance that he won't win.) His strategy then is to pile as many charges as possible and push hard for the accused to take a plea deal.") (June 3, 2019). In a recent opinion,

8

the Ohio Supreme Court similarly characterized the "Justice for Chris" Facebook page in part as "as a platform to attack officials connected with the case against Christopher." *Summers*, 2020-Ohio-5585, at ¶ 5. As such, the Magistrate Judge's conclusion that the Summers' speech and what Doe desires, but is afraid, to say are to different from one another to support standing is simply misguided.

So too did the Magistrate Judge err in her analysis of the Rasawehr case. To be clear, Rasawehr faced numerous criminal charges stemming from his criticism of and towards the Mercer County Sheriff. *See* Rasawehr Complaint (attached). For example, Rasawehr was charged after he stated that the Sheriff was "corrupt" and "stupid," accused him of "hid[ing] behind his badge," and called for an investigation of his conduct. *Id*. While these charges were brought under a separate Ohio statute – Obstruction of Official Business – the fact that he faced criminal prosecution for criticizing public officials heightens Doe's fears that she will be next.

As a result, the Magistrate Judge's finding that Doe's expression is not targeted to a private citizen is without import, given that the "Justice for Chris" Facebook page bears the same quality and yet is still the subject of prosecution, and given that Rasawehr apparently drew the ire of prosecutors for his criticism of the County Sheriff. Moreover, under *Babbitt*, Doe's expression does not have to meet every element of the challenged statutes, so long as she maintains a reasonable fear that she will be prosecuted regardless. *Babbitt*, 442 U.S. at 302. Because she commented in the identical forum being prosecuted in the Summers case, and because she wants to criticize government officials like Rasawehr, Doe maintains a reasonable fear of prosecution, and the Magistrate Judge erred in concluding otherwise.

In addition to being factually inaccurate, the Magistrate Judge's approach is problematic in another respect too. In reaching the conclusion that Doe's speech was too dissimilar from the

Summers' and Rasawehr's to support standing, the Magistrate Judge relied extensively upon legal documents from the Mercer County cases, recounting in detail the nuance of the indictments in those cases, as well as the nature of the charges and the speech involved. But this proves Doe's point. In order to feel secure in communicating critically about the government in Mercer County, an ordinary citizen must not only spend a significant amount of time perusing court dockets, but must also become an overnight expert in the finer points of free speech law. Cases so complex they take pages of briefing to explain can hardly provide adequate notice to ordinary people about what is and is not permissible to say without risking prosecution. When faced with the choice between guessing wrong about the legality of one's expression and risking imprisonment or staying quiet, rational people – including Jane Doe – will choose the latter. *Virginia v. Amer. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988).

Moreover, the Magistrate Judge's opinion assumes that a layperson like Doe would be able to access the records, review them in detail, understand their legal meaning, and conduct a comparative analysis to determine whether her expression was likely to be prosecuted. But laypeople generally lack the legal knowledge and sophistication to handicap their risks in this manner and would require specialized legal advice to feel comfortable navigating the law, an outcome the First Amendment does not tolerate. *See, e.g.,* Jennifer M. Kinsley, *Chill*, 48 Loy. U. Chi. L. J. 253 (2016); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 324 (2010) ("The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day."). The mere fact that Mercer County has levied **62** criminal allegations against the purported operators of a Facebook forum on which Doe commented is enough to make any reasonable person afraid that they will be prosecuted next.

In sum, Doe is reasonably afraid that the Mercer County Prosecutor will criminally charge her for Telecommunications Harassment, Menacing by Stalking, or both. She has engaged in active online commentary about the very same Mercer County officials whose criticism prompted prosecution in the Summers and Rasawehr cases. She has posted in the very same forum that is the subject of prosecution. Due to their highly publicized nature, she is intimately aware – and afraid – of the charges being levied against Mr. Rasawehr, Mr. Summers, and Mrs. Summers in Mercer County. She has self-censored her expression out of fear that she will be next. Under the clear authority of *SBA List*, *Steffel*, *Babbit*, *Holder*, *Broadrick*, and their progeny, Doe has pleaded a well-founded fear of imminent prosecution and has therefore suffered an injury in fact sufficient to support standing. The Court should therefore reject the Magistrate Judge's Report and Recommendation dismissing Doe's action for a lack of standing.

### C. Pre-Enforcement Challenges to Laws Burdening the First Amendment are Critical to the Preservation of Free Speech Rights.

Pre-enforcement anticipatory challenges to laws that burden or criminalize protected expression have been the leading vehicle by which the Supreme Court has shaped its First Amendment doctrine. To be sure, lawsuits seeking to invalidate regulations that violate the First Amendment on their face have been successful across a wide variety of content and a broad spectrum of speech categories. From the campaign speech at issue in *McConnell v. Federal Election Comm'n*, 540 U.S. 90 (2003), to the sexually oriented expression restricted by the Child Pornography Prevention Act in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), the Court has preserved an immeasurable quantity of expression by striking down speech-restrictive laws in advance of their application.

The Magistrate Judge's decision in this case threatens to undermine the important role anticipatory challenges serve by restricting their filing to only those limited instances when a

11

speaker's expression is identical to that which has already been prosecuted. If permitted to stand, the Magistrate Judge's high standard would place an extraordinary burden on speakers and would lead to results that are antithetical to the First Amendment. For example, speakers may be unable to appropriately time the filing of a pre-enforcement challenge so as to avoid federal court abstention and may instead be unwittingly and improperly charged for violating the law. *See Younger v. Harris*, 401 U.S. 37 (1971). This forces those wishing to express themselves to shoulder the burden of defending themselves in criminal court, a costly and frightening proposition. *See Yeager v. United States*, 557 U.S. 110, 117-18 (2009). In addition, the loss of the ability to challenge a statute in advance of its application also creates an undue risk of self-censorship to avoid enforcement, as well as the increased likelihood that speakers will silence themselves altogether to avoid government interference. In each of these instances, constitutionally-protected expression is suppressed that could have been preserved by way of an anticipatory challenge.

Doe's lawsuit emphasizes the critical role anticipatory challenges play in preserving freedom of speech and how such challenges have provided the mechanism for invalidating a wide swath of unconstitutional regulations that would otherwise silence protected expression. As these cases reflect, a more stringent standing requirement does not facilitate the justiciability of facial challenges. Indeed, allowing anticipatory challenges is critical to addressing unconstitutional laws *before* they have a chilling effect or cause injury in having to defend or respond to enforcement activities. To protect the core values of the First Amendment, and to ensure that no more speech than necessary is silenced by unlawful governmental regulation, the Court should reject the Magistrate Judge's approach.

12

The Supreme Court has enjoyed a long and storied history of permitting speakers to challenge laws restricting their speech in advance of criminal prosecution.  As part of this tradition, parties wishing to challenge a statute before its enforcement need only demonstrate a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).  To be sure, speakers have never been required "to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923).  Further, "[w]hen contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Epperson v. Arkansas*, 393 U.S. 97 (1968).  When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."  *Doe v. Bolton*, 410 U.S. 179, 188 (1973).  Indeed, plaintiffs bringing First Amendment challenges to criminal laws have never been required to "first expose [themselves] to actual arrest or prosecution." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979).  This standard enables a plaintiff to challenge the constitutionality of a criminal statute without being "required to await and undergo a criminal prosecution as the sole means of seeking relief."  *Id.* (quoting *Doe*, 410 U.S. at 188).

If permitted to stand, the Magistrate Judge's ruling in this case – that Doe's speech must be identical to that which has been prosecuted – endangers the valuable role that pre-enforcement challenges have played in shaping First Amendment doctrine.  As discussed below, anticipatory challenges have provided the mechanism for invalidating a wide swath of unconstitutional regulations that would otherwise silence protected expression.  It is precisely because pre-

enforcement lawsuits have provided the vehicle by which the courts can safeguard First Amendment rights that the Court should reject the Magistrate Judge's restrictive approach and should instead retain traditional relaxed standing principles in the free speech context.

### 1.    Election Speech

By way of example, the Supreme Court's doctrine regarding core political speech has arisen in large part due to anticipatory challenges to laws restricting campaign contributions and political advertisements.  The development of election speech doctrine through a triumvirate of recent cases – *McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003); *Federal Election Commission v. Wisconsin Right to Life*, Inc., 551 U.S. 449 (2007); and *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010) – demonstrates this point.  As noted by the Court in *Citizens United*, "[p]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence…[because] [t]he right of a citizen to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at 339-340.

An early pre-enforcement challenge to Section 203 of the Bipartisan Campaign Reform Act of 2002 ("BRCA"), which extended restrictions on independent corporate expenditures, was unsuccessful in *McConnell*. *Id*.  Nevertheless, the same provision was attacked in an as-applied challenge in *Wisconsin Right to Life, Inc. v. Federal Election Comm'n*, 546 U.S. 410 (2006), a challenge which the Court held could be maintained.  *Id*.  A year later, in *Federal Election Commission v. Wisconsin Right to Life*, Inc., 551 U.S. 449 (2007) ("*WRTL II*"), the Court sustained an as-applied challenge raising a similar claim to the validity of BCRA Section 203.  *Id*.  In a careful attempt to simultaneously avoid overruling *McConnell* and to vindicate the First Amendment claims made by the *WRTL II* parties, the controlling opinion in *WRTL II* refrained

from invalidating the statute, except as applied to the facts immediately before it. *Id*. This series of holdings ultimately led to the *Citizens United* majority's specific admonition that consideration of a facial challenge was absolutely necessary, as "[a]ny other course of decision would prolong the substantial, nationwide chilling effect caused by…prohibitions on corporate expenditures." *Citizens United*, 558 U.S. at 333. Thus, although *McConnell* did not result in the facial invalidation of the BRCA, it laid the foundation for subsequent as applied and constitutional challenges to the provision. As a result, even where unsuccessful, anticipatory challenges laid the groundwork for future decisions that protect and preserve political expression.

### 2. Commercial Speech and Related Corporate Expression

Although the Court reviews laws curtailing commercial speech under a somewhat more relaxed standard than other forms of protected expression, *Edenfield v. Fane*, 507 U.S. 761, 767 (1993), pre-enforcement challenges are allowed in this context in order to preserve First Amendment values. As the Court has previously stated, "[t]he First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996). Yet, in order to treat as skeptical those regulations that potentially curtail the First Amendment guarantee to free speech, the courts must have the opportunity to review provisions as they affect the messages contained in protected commercial expression, not after the government has drawn its sword.

For example, at issue in *Edenfield v. Fane* was a provision of Florida's administrative code that prohibited certified public accountants (CPA's) from "direct, in-person, uninvited solicitation." *Id.* at 764. The plaintiff, a CPA who regularly made unsolicited telephone calls and scheduled individual meetings with businesses, was prohibited from promoting his CPA practice

under this administrative rule. *Id.* at 763. Before the Rule was enforced against him, Fane sued in federal district court, claiming that the anti-solicitation rule violated the First Amendment, arguing that it was difficult to persuade a business to change accounting services without first having a "detailed discussion of the client's needs and the CPA's expertise, services and fees." *Id.* at 764. The Court agreed that Fane's solicitation activities constituted protected commercial speech. I*d.* at 765. Acknowledging that commercial solicitation "may have considerable value," the Court emphasized the benefits of allowing "direct and spontaneous communication between buyer and seller." *Id.* at 766.

The risks to Fane in proceeding with his speech absent the ability to challenge the restriction in court were daunting. He could have been perceived as a law-breaker in the eyes of both current and potential clients, thereby undermining the exact purpose his speech was intended to serve. In a profession that significantly benefits from a "[p]ersonal interchange [that] enables a potential buyer to meet and evaluate the person offering the product or service," *id.* at 766, the negative association with violating the law would all but destroy Fane's ability to propose his services to potential clients. Likewise, if Fane had chosen to acquiesce to Florida's unconstitutional anti-solicitation ban, he would have been severely crippled in attempting to build his practice. *See id.* at 763. Thus, Fane's ability to challenge the law prior to its enforcement against him was critical to preserving his First Amendment rights.

Pre-enforcement challenges are critical to enforcing the right to speech by corporate purveyors across many spectrums. For example, in *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011)[1], organizations who represented both the "video-game and software industries,"

---

[1] Although not technically a commercial speech case, *Brown* emphasizes that anticipatory challenges can preserve speech that is related to or an integral part of a significant corporate industry. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000), is instructive

brought a pre-enforcement challenge to a California law prohibiting the sale or rental of "violent video games" to minors and requiring the packaging to contain the label "18." *Id.* at 2732-33. The district court concluded the California law violated the First Amendment on its face. *Id.* The Court of Appeals affirmed, and after granting certiorari, the Court affirmed the lower court's decision. *Id.*

Reviewing the law under strict scrutiny, the Supreme Court determined that "California has singled out the purveyors of video games for disfavored treatment–at least when compared to booksellers, cartoonists, and movie producers–and has given no persuasive reason why." *Id.* at 2740. Absent a compelling justification for this differential treatment, California's "effort to regulate violent video games" failed to survive the strict scrutiny analysis. *Id.* at 2741. Yet, if instead of challenging the statute in federal court, the plaintiffs had voluntarily violated the statute and risked enforcement, they could have been penalized up to $1,000 for each separate offense. *See* Cal. Civ. Code § 1746.3 (West 2006). Considering that more than 298 million new video games are sold in the United States each year, the cost of violating the statute was simply too prohibitive to risk. *See* Stephen E. Siwek, *Video Games in the 21st Century: The 2010 Report*, Entertainment Software Association (2010), available at http://www.theesa.com/facts/pdfs/VideoGames21stCentury_2010.pdf. Thus, without the opportunity to bring a pre-enforcement challenge, the video game and software industries would potentially have been silenced by an unduly burdensome restriction on their freedom of commercial expression.

Similar restrictions on commercial speech have been invalidated in pre-enforcement challenges brought in the Supreme Court by the pharmaceutical industry, *Thompson v. W. States.*

on this point as well.

*Med. Ctr.*, 535 U.S. 357, 360 (2002); the alcohol industry, *44 Liquormart*, 517 U.S. 484; the utility industry, *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557 (1980); and, most recently, in the lower federal courts by the tobacco industry, *see, e.g., R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 696 F.3d 1205 (D.C. Cir. 2012) (vacating cigarette labeling requirement and remanding to FDA). Thus, anticipatory challenges have played a significant role in preserving the right of commercial speech across a wide range of enterprise.

### 3.     Sexually Explicit Speech

In *Reno v. American Civil Liberties Union*, 521 U.S. 844, 861 (1997), the Supreme Court allowed a group of twenty plaintiffs to bring a First Amendment challenge to two provisions of the Communications Decency Act of 1996 "immediately after the President signed the statute." Those provisions prohibited the knowing: 1) transmission of obscene images to anyone under 18 years of age, and 2) "sending or displaying of patently offensive messages in a manner that is available to a person under 18 years of age." *Id.* at 859. The Court permitted the plaintiffs' First Amendment challenge to proceed without requiring proof that they faced imminent, real, and likely prosecution. In reaching the merits of the plaintiffs' First Amendment claim, the Court recognized that the statute at issue was a "matter of special concern" because it was a "criminal statute," and noted that "[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Id.* at 872. The plaintiffs' ability to challenge the statute prior to its enforcement was significant, because the Court ultimately invalidated the provisions in question, thereby preserving a vast quantity of speech on the Internet. *Id.* at 885 ("The interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship."); *see also Playboy Entertainment*, 529 U.S. at 826-27.

Similarly, in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 243 (2002), the Supreme Court permitted a group of plaintiffs, ranging from an adult-entertainment trade association to a photographer specializing in erotic images, to bring a First Amendment facial challenge against certain provisions of the Child Pornography Prevention Act of 1996, 18 U.S.C. § 2251 *et seq.* ("CPPA"). The provisions at issue in *Free Speech Coalition* prohibited the possession or distribution of sexually explicit images that appeared to depict minors, even if the images were in fact produced without using minors. *Id.* at 239. The Court allowed the plaintiffs to proceed with their challenge – without having to prove an imminent threat of prosecution – because "a law imposing criminal penalties on protected speech is a stark example of speech suppression." *Id.* at 244. And as the Court pointed out, "few legitimate . . . speakers . . . would risk distributing [material] in or near the uncertain reach of this law." *Id.* As was the case with *Reno v. ACLU*, the Court granted the Free Speech Coalition's challenge to the law and invalidated the CPPA on overbreadth grounds. *Id.* at 258.

In both the *ACLU* and *Free Speech Coalition* cases, online expression was protected from government censorship directly because the plaintiffs were permitted to sue before the laws in questions were enforced against their members.

### 4.      Licensing and Permitting Regulations on Speech

Anticipatory challenges have also played a significant role in shaping the First Amendment analysis that is applied to licensing and permitting regulations. In fact, one of the Supreme Court's leading pronouncements on First Amendment standing – *City of Lakewood v. Plain Dealer*, 486 U.S. 750 (1988) – arose in a pre-enforcement capacity. The procedural history of the case is instructive. *See Plain Dealer Publishing Co. v. City of Lakewood*, 794 F.2d 1139 (6th Cir. 1986). At issue in the case was the distribution of *The Plain Dealer* newspaper - which at the time had

the largest circulation of any daily paper in Ohio - within the City of Lakewood, a Cleveland suburb with a population of approximately 60,000 people.  *Id*. at 1141.  The newspaper company notified the City that it wished to distribute its newspapers to the public through news racks placed on public rights of way within Lakewood and sought the City's cooperation in allowing news racks at 18 locations along three major roads.  *Id*.  Relying on an ordinance that prohibited the private placement of any structure on public property, the City denied the newspaper's requests and refused a meeting with Plain Dealer officials.  *Id*.  The City appeared to be singling out the newspaper for disparate treatment, because it simultaneously allowed telephone booths, bus shelters, mail boxes and utility appliances on its public ways in spite of the ordinance.  *Id*. at 1147.

Because the City foreclosed negotiations, the newspaper filed an action in the Northern District of Ohio seeking injunctive relief and a declaration that the ordinance violated the First and Fourteenth Amendments of the Constitution.  *Id*. at 1141.  The district court found the prohibition unconstitutional, but delayed entry of a permanent injunction for 60 days to give the city time to amend its law.  *Id*.  In response, Lakewood adopted two ordinances allowing the placement of structures on city property under certain conditions.  Lakewood, Ohio Codified Ordinance §§ 901.18, 901.181 (1984) (cited in *Plain Dealer*, 486 U.S. at 753).  One ordinance gave the mayor authority to grant or deny annual news rack permit applications, subject to several conditions, including: 1) approval of news rack design by the Lakewood Architectural Review Board; 2) an indemnification agreement, guaranteed by a $100,000 insurance policy, to protect the City against liability for use and placement of the news racks; and 3) any "other terms and conditions deemed necessary and reasonable by the Mayor."  *Id*. at § 901.18.  The newspaper chose not to seek a permit under the revised ordinances.  Instead, the newspaper amended its federal complaint to assert a facial challenge to the amended enactments.  *Plain Dealer*, 794 F.2d at 1143.  After the

20

district court rejected the newspaper's claims, the case was appealed to the Sixth Circuit, which upheld the news rack prohibition on one of the three major thoroughfares, but found the three licensing conditions to be unconstitutional. *Id*. at 1146.

In affirming and remanding the Sixth Circuit's decision, the Court held that the newspaper had standing to bring a facial challenge to the ordinance without first applying for and being denied a permit. *Plain Dealer*, 486 U.S. 750. As the Court explained, a licensing statute that gives government officials unbridled discretion over the permission or denial of expressive activity constitutes a prior restraint. *Id*. at 757. Alleviating such a regime may actually require a facial challenge because "the mere existence of a licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id*. Moreover, as the Court explained, when a licensing regime lacks standards limiting the licensor's discretion, it is difficult for courts to discern whether the licensor is engaged in impermissible content-based discrimination. *Id*. The delay and challenges "inherent in the 'as applied' challenge can itself discourage litigation," making any eventual relief "too little too late." *Id*. at 758. In this event, opportunities for speech will have been permanently lost. *Id*.

Had the restrictive approach to pre-enforcement review taken by the Magistrate Judge in this case been imposed in *Plain Dealer*, newspaper publishers, distributors, and readers alike would have been subjected to a licensing regime that indefinitely burdened their First and Fourteenth Amendment rights and created a distinct risk of prolonged government censorship. Such an outcome would also have undermined long-standing First Amendment jurisprudence designed to limit the government's ability to suppress expression before it has been communicated, namely the doctrines of prior restraint, overbreadth, and vagueness.

In like manner, had the Magistrate Judge's restrictive approach to pre-enforcement review been imposed on the petitioners in *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002), religious organizations and their individual members would have been forced to choose between violating either a criminal ordinance or expressing their deeply-held moral beliefs. The *Watchtower* case involved a Village of Stratton ordinance which made it a misdemeanor to engage in door-to-door advocacy for any "cause" without first registering for and receiving a permit from the office of the mayor. Village of Stratton, Ohio Ordinance § 1998-5; *Watchtower Bible*, 536 U.S. at 165-66. The ordinance also required that a permit bearing the permit-holder's name be carried on one's person and be produced upon demand by police or residents. *Id*.

The regulation was challenged in federal court by a group of Jehovah's Witnesses "who consider[ed] it part of their individual responsibility before Jehovah God to follow Jesus' example and obey his commandment to go from house to house to speak to the people about the Kingdom of God." Brief for *Watchtower* Petitioners, 2001 WL 1576397, at *2. The suit was filed against a backdrop of hostility between municipalities and the Jehovah's Witnesses regarding their door-to-door ministry.[2] *Id*. Believing they derived their authority from scripture and that seeking a permit from a municipality to preach would amount to "an insult to God," the Petitioners did not apply for a permit. *Watchtower Bible*, 536 U.S. at 157-58. Instead, the Witnesses mounted a pre-enforcement facial challenge on First Amendment grounds, alleging that the ordinance interfered with their protected free speech and exercise rights. *Id*. at 153. The Court agreed. *Id*. at 150. Considering the ordinance as it applied to religious proselytizing, anonymous political speech, and

---

[2] Difficulties between ministers associated with a particular congregation of Jehovah's Witness in Wellsville, Ohio and Village of Stratton officials dated back to at least 1979. *See* Brief for *Watchtower* Petitioners, 2001 WL 1576397.

the distribution of handbills, the Court found: 1) that the ordinance necessarily resulted in surrender of anonymity; 2) that the permitting requirements imposed an objective burden on religious and political speech; 3) that the ordinance effectively banned a significant amount of spontaneous speech; and 4) that the ordinance was not narrowly tailored to the village's interest in protecting the privacy of residents or preventing fraud and crime. *Id.*

Stratton is by no means the first municipality that has attempted to use permitting schemes to prohibit or regulate protected expressive activities of Jehovah's Witnesses and others. However, the breadth of First Amendment interests burdened by the Stratton ordinance is particularly noteworthy. The scope of the ordinance was so overly broad that it impinged not only the protected religious activities of Jehovah's Witnesses, but also the rights of those not before the Court, including other religious and political advocates and all potential listeners. As the Court explained, "[i]t is offensive – not only to the values protected by the First Amendment, but to the very notion of a free society – that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." *Watchtower Bible*, 536 U.S. at 165. The ability of the Jehovah's Witness Petitioners in *Watchtower* to challenge the licensing ordinance before it was enforced therefore preserved the right of countless speakers to present and consume protected expression.

> **5.** **Absent the ability to raise a pre-enforcement challenge to the facial validity of laws restricting speech, speakers like Doe will be forced to engage in decision-making that is antithetical to the First Amendment.**

In light of the significant role anticipatory challenges have played in preserving free expression across a wide range of content, the elimination of pre-enforcement facial challenges would pose significant risks to both the quality and quantity of speech available in the marketplace of ideas. For example, in the commercial speech context, speakers proposing business transactions

may be reluctant to place their professional reputations and livelihoods at stake by waiting until prosecution is imminent to file suit.  As highlighted by the *Fane* case, it is imperative that commercial speakers have advance knowledge of whether their speech is constitutionally protected and therefore permitted or otherwise subject to governmental regulation.  *Fane*, 507 U.S. at 763, 766.  Absent the ability to seek a declaratory judgment prior to enforcement, companies are not likely to invest financial and human resources in advertisements and solicitations that may result in criminal charges or hefty civil fines.  As such, commercial speech will likely disintegrate if the Sixth Circuit's heightened standing requirements are upheld.  And of course, curtailing speech proposing commercial transactions is likely to have an overall impact on commerce as well.  *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).

Moreover, as was the case with the statute invalidated in *Free Speech Coalition*, 535 U.S. 234, speakers could fail to time the filing of their lawsuits appropriately and could instead wind up being criminally prosecuted under unconstitutional laws, a fear Doe retains here.  Prior to the Supreme Court's *Free Speech Coalition* decision striking down the CPPA, several individuals had been charged with and convicted of federal felonies for violating the Act.  *See, e.g., United States v. Fox*, 248 F.3d 394, 398-99 (5th Cir. 2001) (sustaining defendant's CPPA conviction and 46-month prison sentence); *United States v. Mento*, 231 F.3d 912 (4th Cir. 2000) (upholding constitutionality of defendant's CPPA conviction).  These individuals shouldered the weighty burden of defending themselves against unconstitutional criminal charges, as well as serving prison sentences for invalid convictions, before the law was declared invalid.  *See Yeager*, 557 U.S. at 117-18 (noting that criminal prosecution subjects defendant to "embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as

enhancing the possibility that even though innocent he may be found guilty"). If permitted to stand, the Magistrate Judge's decision below increases the likelihood that speakers who lose the race to court to aggressive prosecutors like Mercer County's will wrongfully face criminal sanctions for their speech. And once an individual faces criminal charges, it is unlikely that he will be able to separately challenge the facial validity of the law in a civil suit or to otherwise obtain relief from prosecution. *See Younger v. Harris*, 401 U.S. 37 (1971) (requiring federal courts to abstain from ruling upon constitutional issues with state criminal prosecutions while the state criminal charges are pending). Thus, the elimination of anticipatory challenges as a vehicle for vindicating First Amendment rights would likely lead to the filing of more and more criminal charges against protected speech.

In the face of this possibility, it is also possible that speakers who are unwilling to risk imminent prosecution will censor their speech in burdensome ways or eliminate it altogether. While there is little case law to cite as actual proof of the chilling effect a speech-restrictive law imposes, that fact is self-fulfilling. Speakers who chose not to present expression because it may trigger a criminal or civil penalty do not wind up in court; rather, their First Amendment injury by its very nature occurs privately, quietly, and outside the view of the judiciary. Each of these outcomes is fundamentally antithetical to the ideal of free expression protected by the First Amendment. As such, as a matter of constitutional jurisprudence and sound policy, the Magistrate Judge's restrictive standing approach cannot be permitted to stand.

## III. Conclusion

For the foregoing reasons, the Magistrate Judge's December 17, 2020 Report and Recommendation dismissing Plaintiff Jane Doe's action for lack of standing should be rejected by the Court.

25

Respectfully Submitted,

 /s/ Jennifer M. Kinsley
JENNIFER M. KINSLEY (0071629)
Kinsley Law Office
Post Office Box 19478
Cincinnati, OH 45219
kinsleylawoffice@gmail.com
513.708.2595


/s/ Matt Miller-Novak
Matthew Miller-Novak (Ohio Bar No. 0091402)
Barron Peck Bennie & Schlemmer Co., LPA
3074 Madison Rd.
Cincinnati, OH 45209
mmn@bpbslaw.com
513.721.1350

Counsel for Plaintiff Jane Doe


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing disclosures was provided to all counsel of record via email on the 31st day of December, 2020.

 /s/ Jennifer M. Kinsley
JENNIFER M. KINSLEY (0071629)

26